We'll hear argument now in AMTAX Holdings against Full Circle Villagebrook. Mr. Pettit. Good morning, Your Honors. Eric Pettit for the appellants. May it please the Court, this appeal involves a de novo review of a pure and narrow issue of contract interpretation, and so I hope to devote my limited time to addressing the relevant contract terms while pointing out along the way how they differ from corresponding terms in the various cases on which Full Circle relies and how Full Circle's position cannot be reconciled with the language applicable here. The question presented is how to calculate Full Circle's option price under Section 7.4J of the Limited Partnership Agreement, or LPA. So it makes sense to start there. Significantly, 7.4J does not say that the option price is equal to the amount my clients would receive if proceeds from a sale of the property were distributed in accordance with Section 6.2. And so right off the bat, this LPA is materially different from the agreements at issue. If you could use real words, we would appreciate it. You might have a private supply of initialisms, but we don't. I apologize, Your Honor. The LPA is materially different. If you could use real words, we would appreciate it. LPA is not a real word. It's a private initialism. I understand and I apologize, Your Honor. The Partnership Agreement is materially different from the agreements at issue in three of the cases cited by Full Circle, specifically the Berkshire and Waterford cases in Florida and the Urban 8 Fox Lake case here in Illinois, since each of those agreements identified the specific distribution provision that applied to the option price calculation. Instead, Section 7.4J says that the option price is equal to the amount my clients would receive if the property were sold and the proceeds from such sale were applied in accordance with the agreement. Thus, we need to look beyond 7.4J to determine how proceeds from a sale of the property would be applied under the Partnership Agreement. Full Circle claims that we need to look no further than Section 6.2B. 6.2B, however, specifically states that it is subject to the provisions of Section 6.3 below. So we cannot simply stop there, but instead need to figure out how and or when 6.2B is subject to 6.3. Section 6.3B says that any capital proceeds from a terminating capital transaction remaining after payment of the partnership's debts shall be distributed to those partners with positive capital accounts in proportion to their capital account balances. Thus, unlike the corresponding provisions in cases on which Full Circle relies, including the landing case... What happens if some partners have positive capital accounts and some don't? Would then only the ones with positive capital accounts receive any distribution? Those distributions would be made to the partners with positive capital accounts up until the point that those capital accounts are fully paid and then the remainder of any remaining proceeds would be distributed under Section 6.2B. You know, that doesn't really answer the question. Let me ask. Here. The way I read the 6.3B language about positive capital accounts is that it's describing how both are divided. If there is a financial event whose purpose is the dissolution of the partnership. In such an event, any limited partners who have a positive account balance will receive proceeds in proportion to their positive account balance. And any partners with negative account balances will not receive any proceeds. I do not, I cannot, and I have really tried. I do not understand why you think the language about positive capital accounts shunts this transaction to 6.3B rather than 6.2B. I think the answer to that, Your Honor, comes from the definition of terminating capital transaction. And that term is defined in the partnership agreement to mean a capital transaction that's either involving or resulting in the termination and winding up of the business of the partnership. So while a sale of the property in the regular course may not involve the termination and winding up of the partnership's business, it's indisputable that any sale of the property, regardless of the circumstances, will result in the termination and winding up. And the reason why we know this is because Section 2.5A of the partnership agreement says that the partnership shall be dissolved upon the sale or other disposition of all or substantially all the assets of the partnership. And it's undisputed that the property constitutes substantially all the partnership's assets. And that was expressly recognized by the Massachusetts Supreme Judicial Court in the TDC case. They addressed language that was identical to Section 2.5A and rejected the argument that the sale of the property and the dissolution of the partnership are sufficiently distinct events to break the chain of causation between the sale and the resulting liquidation. The court there concluded that the dissolution is mandatory and subject to no condition other than the sale. And similarly here, because there is no circumstance in which a sale of the property would not result in the termination and winding up of the partnership, every sale of the property is a terminating capital transaction, as that term is defined in the partnership agreement, and thus is subject to Section 6.3B where, as here, the limited partners have positive capital accounts. And the final provision of... I'm sorry. If we read the contract the way you request, it seems to me that Section 6.2B has virtually no role because all sales would end the partnership. So what would the role of 6.2B be? So the role of 6.2B would be in two circumstances. First of all, 6.2B involves any type of capital transaction. And so if there's a refinancing, if there were a sale of, for example, the parking lot that the partnership owned, some sale that didn't involve a complete sale of the entire property, that would fall under Section 6.2B. And then the other thing is that, and this brings me to Section 6.3C. Section 6.3C says that the parties intend that, as a result of the application of the allocation and distribution provisions contained in Article VI, any capital proceeds from a terminating capital transaction will be distributed in the same manner as capital proceeds are distributed under 6.2B. And so 6.3C kind of ties together 6.3 and 6.2B. And what it means is that, as the partnership's tax matters partner, Full Circle was supposed to have allocated sufficient losses to my clients over the life of the partnership such that their capital account balance was either reduced to zero or equaled the 90-10 ratio in 6.2B. But because they failed to do so, my clients were denied taxable losses that were one of the key benefits they bargained for under the LPA, and instead were left with a large positive capital account. Full Circle never made any attempt to fix this because that would require Full Circle to pay taxes on gain it was allocated in order to right-size the capital account ratio and bring it into accordance with 6.2B. Thus, by seeking to benefit from the application of 6.2B without complying with the allocation requirements of 6.3C, Full Circle is seeking to have its cake and eat it too. In conclusion, our interpretation regarding the calculation of the option price brings all the provisions of the LPA into harmony without adding any language rendering any terms superfluous or meaningless. By contrast, Full Circle's interpretation relies on distinctions between sale proceeds and liquidation proceeds and between regular sales and bankruptcy sales that are absent from the LPA and would allow Full Circle to receive a windfall based on its failure to comply with 6.3C. And with that, Your Honors, I'd like to reserve the remainder of my time for rebuttal. Is there any discussion? Thank you, Your Honors. It's a pleasure to be here. May it please the Court. I represent the appellee. Initially, to kind of highlight the last point that counsel made, there was no claim below that my clients failed to allocate losses in violation of the partnership agreement and that thereby caused this positive capital account to exist. The positive capital account exists by operation of accounting principles and the allocation of tax credits, the housing credits that are going to the limited partner, those benefits do not reduce the capital contributions. So the capital account starts at a number. Housing credits are allocated on an annual basis to the limited partner, but it doesn't reduce their capital account. What reduces the capital account is the allocation of losses, and there are only so many losses that can be allocated, and they got 99.99% of those. So the suggestion that we're going to have a windfall because we failed to allocate losses is just incorrect at best. Now, relative to the application of 6.3 versus 6.2B, it is also incorrect to suggest that when we were at the district court, all we said was, hey, look at 6.2B. We didn't say that then. We're not saying that now. We invite a wholesome review of the entire contract, section 2.5, section 6.2B, section 6.3, and section 7.4J. The district court recognized below that those were the four applicable provisions in the partnership agreement to answer the question of what this option price should be. We invited the district court to do that, and it did so. So when you do that, you're able to harmonize the contract and the various provisions within it that relate to how you determine this option price. Section 7.4J clearly says we need to look at the fair market value of the property, what would happen if it sold, and what would the limited partners receive under this agreement from a sale. So you look at the other provisions in the partnership agreement to determine that. Section 2.5 makes it abundantly clear that there's a distinction between a sale and a liquidation. You then look at those provisions. What are the provisions that govern a sale? 6.2B, and it results in a 90-10 distribution of residual proceeds in favor of the general partner. It doesn't produce a windfall for the general partner. It does finally, after 15 years of compliance and operation and doing everything that they were supposed to do as a general partner, they receive the economic benefit that they bargained for when they chose to participate in this program and invited the former original parties behind the limited partner into the partnership in exchange partly for this important option. And it allows the equity to remain with the property and be redeployed back into the community to do other things. That's the business deal. That's what's reflected plainly and unambiguously in this partnership agreement, and that's what this now limited partner wants to plainly disrupt to create a windfall for themselves because they want this positive capital account. What about their argument about Article 1 and the definition of terminating capital transaction making 6.3B kick in? It doesn't make it kick in. Because of the resulting in language. Sure. I would respectfully submit it doesn't mean that it kicks in. I cannot dispute that the definition of terminating capital transaction has the definition to include a sale. But I would respectfully submit you have to look at 6.3 in the context of the agreement because the first thing we know from 6.3A is upon liquidation and dissolution of the partnership. So we're in 6.3 if we're in liquidation and dissolution. So the first thing you do is satisfy Section A. Then, because we're in liquidation and dissolution, if there are capital proceeds from a terminating capital transaction, then that's when that would apply. We're not there. We are under 6.2 because we're talking about a hypothetical sale of the property. So unless we are in liquidation or dissolution, the fact that the terminating capital transaction includes the definition that it does doesn't mean that we do it. We are looking at 7.4J and trying to determine from a hypothetical sale of the property what would they receive. And 6.2 couldn't be more clear about that because you have the context of the definition of the heading. We're not arguing that the heading changes or alters the interpretation of the agreement, but it provides very clear context for what the party's intended here. 6.2B, application and distributions prior to dissolution. So we have very clear separate provisions in the partnership agreement, and we have a very clear sequencing of events whereby under 6.2A, if we have cash flow to distribute on an annual basis, we will do that. That is occurring prior to dissolution. Under Section 6.2B, distributions of proceeds from a sale or refinancing. So if there is a capital event like a sale that occurs prior to dissolution, which we are talking about here as the hypothetical sale for the proxy for the option price, we utilize 6.2B to make that determination of what happens for the option price. And then with respect to 6.2B, there was an argument made just now that, well, you could just sell the parking lot. No, you can't. It's like saying you could just sell half the building. You just can't do that. And I don't believe that that argument was really ferreted out below or in the briefs before the court. By the way, why can't you sell half the building? That's what a condominium project is. Well, this is an apartment building, Your Honor, and they're not singly owned units like you would have in a condominium. It's apartment. You can convert it. You can sell the upper stories to one company and the lower stories to another. I don't think it's impossible. You may say it shouldn't affect our reading of the contract, but I don't see why you say it's impossible. I apologize if impossible is probably the wrong word to use, but under the facts and circumstances and the ownership structure here, you wouldn't be able to do it. Yes, I do acknowledge that there could be a set of circumstances that you could ferret out to make that happen, but under the option here, we're supposed to look at the property. We're supposed to appraise the fair market. A lot of lawyers devote their careers to making things like that happen. I apologize to them. I meant no disrespect. With respect to Section 6.3c, that's a savings clause, and as the district court recognized, if we were to interpret the agreement the way that an appellant is, it would result in a defect, and 6.3c would then step in to cure that to ensure there's a 90-10 distribution if we're going to be in that setting under 6.3, which we're not even there. Relative to the TDC case out of Massachusetts, I just respectfully suggest that counsel's wrong. They have noted in their papers that I was involved in that case. I am and I still remain involved representing that client out in Massachusetts. The issue before the TDC court was not how do you determine an option price. The issue before the TDC court was how do we determine a purchase price under Section 42.I.7, minimum purchase price pursuant to which a nonprofit can buy a property at the end of the compliance period if they have that right for debt plus taxes. It's affectionately called a $1 over debt rofer. The argument before the court there was the phrase attributable to such sale. So under Section 42.I.7, if they have taxes attributable to the sale, they need to be included in the purchase price. Our clients were arguing that there is a break in the causation because you have, in this instance, here full circle, for example, you have an option price. We have a sale. It triggers a subsequent event, which is a dissolution and liquidation of the remaining assets of the partnership, and then the partnership will eventually dissolve and liquidate. We were arguing in TDC that that distinction breaks the chain of causation such that taxes that would otherwise be due to the investor at exit from the partnership should not be included in the minimum purchase price. Unfortunately, the Massachusetts Supreme Judicial Court disagreed with us, but that did not have anything to do with determining an option price, and the issue before the court was not even whether or not a sale is separate and distinct from the events that would later trigger the dissolution and liquidation. And with that, Your Honors, I don't have anything else other than to close that every court so far that has looked at these issues has made the similar determination as the district court did below, and we respectfully request that you affirm. Thank you. Thank you, Counsel. Mr. Pettit, anything further? Yes, just very briefly, Your Honor. So first, this is an issue of first impression because none of the other cases dealt with a partnership agreement that had the language that this partnership agreement has, and we explain in our papers how they're different. I also wanted to address the claim that because this is a hypothetical sale that somehow the 6.3b doesn't kick in. What the parties bargained for was that the limited partner would receive the amount that they would receive if there was an actual sale. So what they bargained for was not if there was a hypothetical sale. 7.4j says what they would receive if there was a sale. So this distinction between hypothetical and actual is not important. And then the last thing is on the defect. The defect of 6.3c, it explains exactly how that defect is to be cured, which is something the general partner needs to do, allocating losses. Thank you, Counsel. Thank you. The case is taken under advisement.